[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14049

_____

D.C. Docket No. 1:18-cv-24272-RS,
Bkcy No. 16-bkc-1-389-AJC


In re: LIZA HAZAN,

                                                        Debtor.

_____


NLG, LLC,

                                                        Plaintiff - Appellant,

versus

HORIZON HOSPITALITY GROUP, LLC,
SELECTIVE ADVISORS GROUP, LLC,
LIZA HAZAN,

                                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 1, 2021)

Before WILLIAM PRYOR, Chief Judge, JORDAN and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This bankruptcy case began in 2007, when NLG, LLC ("NLG") sold a home on Fisher Island (the "Property") to Liza Hazan ("Hazan") for $5,100,000, receiving a purchase money note (the "Note") and mortgage (the "Mortgage") on the residence from Hazan.  The Property would turn out to be the subject of years of protracted litigation before at least six judges and in two states.  The upshot of this was a series of orders addressing the rights of NLG, Hazan, and Selective Advisors Group, LLC ("Selective"), a company owned and controlled by Hazan's husband, concerning the Property, the Note, and the Mortgage.  On January 11, 2016, one day before the property was to be sold, Hazan filed for relief under Chapter 11 of the Bankruptcy Code in the Southern District of Florida.  Not surprisingly, NLG filed a proof of claim against the Property.  In response, Hazan and Selective began adversary proceedings asserting that NLG no longer retained any rights or claims to the Property, and the bankruptcy court agreed.

NLG appealed the bankruptcy court's decision to the district court, claiming that the Rooker-Feldman doctrine prevented the bankruptcy court from considering any of the issues raised during the adversary proceedings.  The district court concluded, however, that the Rooker-Feldman doctrine was inapplicable.  It then

2

dismissed NLG's claims on the ground of equitable mootness. NLG now appeals the district court's order. We affirm the judgment of the district court.

I.

These are the essential facts necessary to understanding the instant appeal:

A. *Litigation in the Florida courts.*

Litigation began in 2007 shortly after Hazan purchased the Property when NLG sued Hazan for breach of the purchase money promissory note. In April 2008, Judge Robert N. Scola of Florida's Eleventh Judicial Circuit in Miami-Dade County entered a default final judgment (the "Scola Judgment") against Hazan and in favor of NLG in the amount of $1,618,071.29 with 11% interest per annum.

NLG sued Hazan again in 2011, in the same state court, this time seeking to foreclose on the Mortgage. In February 2014, Circuit Judge Spencer Eig issued an order finding, however, that NLG could not foreclose on the Property. Rather, it could only recover the monetary Scola Judgment since it had elected a monetary remedy instead of foreclosure in its previous action (the "Eig Order"). NLG appealed this decision to Florida's Third District Court of Appeal.

While all of this was happening, back in 2012, a foreign corporation called 9197-5904 Quebec, Inc. obtained a $5 million judgment against NLG in a wholly unrelated litigation in New York Supreme Court (the "Quebec Judgment"). Selective acquired the Quebec Judgment against NLG from 9197-5904 Quebec

and recorded the judgment in the Circuit Court in Miami-Dade County.  This case was assigned to Judge Peter Lopez.  Judge Lopez assigned NLG's interest in the Scola Judgment -- and all of its rights and claims against Hazan -- to Selective for the purpose of partially satisfying the Quebec Judgment, which NLG now owed to Selective (the "Lopez Assignment Order").[1]  In August 2014, Selective filed a satisfaction of the Scola Judgment and the Mortgage in the Circuit Court, giving credit to NLG towards satisfying the Quebec Judgment.

After the Lopez Assignment Order, the Eig Order was reversed on appeal by Florida's Third District Court of Appeal.  NLG, LLC v. Hazan, 151 So. 3d 455, 456–57 (Fla. Dist. Ct. App. 2014).  On remand, and despite the fact that the Lopez Assignment Order assigned all of NLG's rights and claims against Hazan to Selective, Judge Monica Gordo (who had taken over the case from Judge Eig), entered a foreclosure judgment in favor of NLG in December 2014 (the "Gordo Foreclosure Judgment").  Selective unsuccessfully moved to intervene in this proceeding.  The Gordo Foreclosure Judgment determined that NLG was entitled to more than $4.8 million, and set the Property for sale on January 12, 2016.  The

---

[1] Following entry of the order, NLG moved the court to reconsider the Order of Assignment, asserting that because the Scola Judgment was the subject of an ongoing appeal, it could not be judicially assigned.  Judge Lopez denied NLG's motion, ruling that the assignment of the interest to Selective did not "affect the validity of what's up on appeal."  He clarified that, "win or lose [the appeal], whatever happens, now [Selective] own[s] it instead of [NLG]."

court also ruled that Hazan was entitled to a right of redemption pursuant to Fla. Stat. § 45.0315 -- that is, she could avert the sale before it took place by paying the $4.8 million judgment amount to NLG.

In sum, the Scola Judgment awarded NLG approximately $1.6 million for breach of the Note. The Eig Order concluded that NLG could not foreclose on the Property because it had made an election of remedies in the previous action before Judge Scola. The Lopez Assignment Order then assigned NLG's interest in the Scola Judgment and all of its rights and claims against Hazan to Selective. Lastly, the Gordo Foreclosure Judgment reversed the Eig Order, entered a foreclosure judgment in favor of NLG, set a date for the sale of the Property, and found that NLG was entitled to a foreclosure judgment in the amount of $4.8 million.

## B. *Hazan's Bankruptcy.*

On January 11, 2016, one day before the scheduled foreclosure of her home, Hazan filed for relief under Chapter 11 of the Bankruptcy Code, staying the sale. As part of the bankruptcy proceedings, NLG filed a proof of claim against the Property in the amount of the Gordo Foreclosure Judgment. In response, Selective initiated an adversary proceeding against NLG seeking a determination of the nature and extent of the proof of claim, which Hazan joined. Selective and Hazan argued that NLG had no remaining claim against either Hazan or the Property based on the state court orders and judgments -- in particular, the Lopez

5

Assignment Order which had assigned all of NLG's rights and claims against Hazan to Selective.

On October 31, 2017, the bankruptcy court entered Final Judgment on Counts I, II, and III of Plaintiffs' Third Amended Complaint Determining Validity, Priority and Extent of Liens and Setting Trial on Counts IV Through IX (the "Bankruptcy Judgment").[2] Noting the apparent conflict between the Lopez Assignment Order and the Gordo Foreclosure Judgment, the court set about to determine the rights of the parties. It then reconciled the state court judgments. The bankruptcy court concluded that Hazan had effectively exercised her right to redeem the Property, because her debt to NLG had been paid: Selective had applied the Note (in the form of the Scola Judgment) and the Mortgage in partial satisfaction of the Quebec Judgment NLG owed, leaving NLG with no further rights or claims to the Property. But in order to give full faith and credit to the Gordo Foreclosure Judgment, the bankruptcy court determined that NLG should be credited $4.8 million (the amount of the Gordo Foreclosure Judgment), rather than the $1.6 million awarded in the Scola Judgment, towards its satisfaction of the $5 million Quebec Judgment owed to Selective. NLG appealed the judgment of the bankruptcy court to the district court.

---

[2] Hazan subsequently moved to withdraw Counts IV through IX, which the bankruptcy court granted.

Following entry of the Bankruptcy Judgment, Hazan filed an amended disclosure statement (the "Disclosure Statement") and an amended plan of reorganization (the "Plan"). The Disclosure Statement recognized several valid claims against the Property but, as a result of the Bankruptcy Judgment, did not recognize NLG's claim. The Plan specifically dealt with the other claims. According to the Disclosure Statement, JPMorgan Chase Bank, N.A. ("Chase Bank") agreed to withdraw its objections to the Plan. The Disclosure Statement recognized that Chase Bank had a first-priority security interest that would have adequate protection from other creditors in the form of an equity cushion on the Property. Another creditor with a valid claim against the Property, 6913 Valencia, LLC, agreed to subordinate its claim until the claims with higher priority, including Chase Bank's claim, were satisfied. Still another creditor, Valencia Estates Community Association, Inc., settled its claim against the Property and withdrew its objection to the Plan. The Internal Revenue Service also held a secured claim and was to be paid out over ten years. The Disclosure Statement also noted that the equity in the Property would support a refinancing, which could be used to support a funding plan if necessary.

The bankruptcy court held a confirmation hearing on the Plan on May 30, 2018. At the hearing NLG advised the bankruptcy court that it had an appeal

pending in district court.[3]  NLG also confirmed that there was no stay in place.

The bankruptcy court expressly warned NLG that if Plan confirmation and

consummation occurred it could "moot out the appeal . . . ."  Notably, NLG raised

no objection to the entry of the confirmation order, nor did it seek a stay during the

hearing.  The bankruptcy court then entered an order approving Hazan's Plan on

June 11, 2018.  Thereupon, Hazan began making payments under the Plan.  On

August 8, 2018, NLG finally moved the bankruptcy court to stay the proceedings

until the appeal in the instant case was filed.  The bankruptcy court denied the

motion.

## C. *The instant appeal.*

On October 17, 2018, NLG filed a notice of the instant appeal -- its second

appeal of the Bankruptcy Judgment -- this time claiming that the bankruptcy

court's order violated the Rooker-Feldman doctrine.[4]  NLG also moved the district

---

[3] The district court dismissed this appeal on standing grounds because a receiver assigned to act on behalf of NLG had not consented to the appeal in advance of filing.  See NLG, LLC v. Selective Advisors Grp., LLC, No. 17-cv-24127-GAYLES, 2018 WL 638349 (S.D. Fla. Jan. 31, 2018).

[4] On December 6, 2018, while NLG's appeal was pending, the bankruptcy court entered an order discharging Hazan.  NLG then filed an adversary proceeding seeking revocation of the confirmation and discharge orders.  On March 12, 2019, the bankruptcy court dismissed the adversary proceeding with prejudice, observing that "Hazan's plan has been substantially consummated and that NLG failed to timely seek a stay" and holding, "[a]fter considering the balance of the equities," that NLG's "claims for revocation [were] equitably moot."  NLG did not appeal this order.

court to stay the judgment pending the disposition of the appeal and then filed an amended motion to stay; both motions were denied.

On September 18, 2019, the district court dismissed NLG's appeal. The court first addressed whether the <u>Rooker-Feldman</u> doctrine prevented the bankruptcy court from considering the issues raised by Hazan and Selective. It concluded that the doctrine was inapplicable because Selective was not a party to the state court foreclosure action and neither Hazan nor Selective sought to overturn a state court judgment in federal court. The district court then granted Hazan's and Selective's motion to dismiss the appeal on the ground of equitable mootness, finding: (1) NLG had failed to timely seek or obtain a stay, waiting "over nine months after the Bankruptcy Judgment was entered, almost three months after the confirmation hearing, and nearly two months after the entry of the Confirmation Order" to move for a stay, despite having been warned that failing to obtain a stay would likely result in equitable mootness; (2) the Plan had been substantially consummated; and (3) "modifying the reorganization plan . . . would adversely affect all creditors who relied on the extinguishment of NLG's claim in agreeing to the reorganization plan."

This timely appeal followed.

II.

We first address whether the bankruptcy court had jurisdiction to consider the issues raised by Hazan and Selective. NLG claims that the issues litigated in bankruptcy court were the same issues rejected by the state court judge in the foreclosure action before Judge Gordo and, therefore, the bankruptcy court's order violated the Rooker-Feldman doctrine. Under Rooker-Feldman, a losing party in state court is barred from seeking what in substance would be appellate review of the state court judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights. See D.C. Ct. of Appeals v. Feldman, 460 U.S. 462, 482 (1983); Rooker v. Fidelity Tr. Co., 263 U.S. 413, 416 (1923). The Rooker-Feldman doctrine applies only in a narrow set of "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). Rooker-Feldman does not apply when the parties to the federal case are not the same as the parties to the state case. Johnson v. De Grandy, 512 U.S. 997, 1006 (1994) (holding that because the United States was not a party to the state court action, Rooker-Feldman was not a bar to its federal claims); Lance v. Dennis, 546 U.S. 459, 466 (2006) ("The Rooker-Feldman doctrine does not bar actions by nonparties to the

10

earlier state-court judgment [even where] they could be considered in privity with a party to the judgment."); Roe v. Alabama ex rel. Evans, 43 F.3d 574, 580 (11th Cir. 1995) (holding Rooker-Feldman did not apply because the plaintiffs were not parties in the state court action).  We review a district court's determination about the applicability of Rooker-Feldman de novo.  Lozman v. City of Riviera Beach, 713 F.3d 1066, 1069 (11th Cir. 2013).

We agree with the district court that the Rooker-Feldman doctrine does not apply.  First, the parties in the state court foreclosure action and the bankruptcy case were not the same -- Selective was not a party to the state court proceedings. While NLG contends that Selective was a "de facto" party under Florida law, there is no evidence that Selective exerted influence over Hazan's legal strategy in the state court foreclosure action.  Lage v. Blanco, 521 So. 2d 299, 300 (Fla. Dist. Ct. App. 1988) (finding a third party to be a de facto party where it "ha[d] such control . . . as to be entitled to direct the course of [the] proceedings . . . .") (quotation omitted); see also Visoly v. Sec. Pac. Credit Corp., 768 So. 2d 482, 485, 489 (Fla. Dist. Ct. App. 2000) (finding that delaying foreclosure through "9 years of vexatious litigation" and "generat[ing] unnecessary litigation expenses" rendered a

11

third party a de facto party to the litigation).  Selective's actions do not make it a "de facto" party under Florida law.[5]

Second, neither Hazan nor Selective sought to have the bankruptcy court overturn the Gordo Foreclosure Judgment.  Rather, Hazan and Selective just asked the bankruptcy court to determine the rights of NLG, Hazan, and Selective based on, not in spite of, the previously rendered judgments.  And that is exactly what the bankruptcy court did.  The Bankruptcy Judgment recognized that all of the rights, claims, and benefits held by NLG against Hazan were judicially assigned to Selective by the Lopez Assignment Order.  It also recognized that the Gordo Foreclosure Judgment granted NLG, and not Selective, the right to foreclose, but found that Hazan exercised her right to redeem the Property by satisfying the judgment before the foreclosure sale and, therefore, NLG held "no further rights to any claims against [Hazan] with respect to the Note and Mortgage."  Finally, "[g]iving full faith and credit to the Gordo Foreclosure Judgment," the bankruptcy court determined that "NLG established its entitlement to a greater credit than that in the Lopez Assignment Order, in the grand total sum of $4,876,654.29."  The

---

[5] NLG also argues that issue preclusion bars re-litigation of the foreclosure because Selective did not appeal the order denying its motion to intervene in the proceedings before Judge Gordo.  We are unpersuaded.  In order for issue preclusion to apply, both cases must involve the same parties or their privies.  See Topps v. State, 865 So. 2d 1253, 1255 (Fla. 2004); Pearce v. Sandler, 219 So. 3d 961, 965 (Fla. Dist. Ct. App. 2017).  Since the parties in the state court proceedings were not the same as the parties in the bankruptcy court proceedings and Selective was not in privity with Hazan, this appeal is not barred by issue preclusion.

12

bankruptcy court neither found the foreclosure judgment wrongful, nor did it overturn the state court order; rather, it determined the rights of the parties in light of the state court judgments.

The bankruptcy court was not barred from considering the issues raised by Hazan and Selective.

### III.

We turn then to the question of whether the district court properly dismissed the appeal for equitable mootness. NLG claims that it was error for the district court to apply equitable mootness, arguing that the doctrine applies only in cases involving large corporate bankruptcies, not in individual bankruptcies. NLG also says that there are no transactions that would have to be rescinded if we were to reverse the Bankruptcy Judgment since the debtor has only one asset, the Fisher Island Property, which Hazan claimed was exempt under 11 U.S.C. § 522(b)(3).

The equitable mootness "doctrine provides that reviewing courts will, under certain circumstances, reject bankruptcy appeals if rulings have gone into effect and would be extremely burdensome, especially to non-parties, to undo." Bennett v. Jefferson County, 899 F.3d 1240, 1247 (11th Cir. 2018). Although the word "mootness" is used to describe the doctrine, in fact it "does not reference actual mootness at all." Id. Rather, the doctrine "turns on equitable and prudential concerns which focus on whether it is reasonable to entertain the contentions of the

parties challenging an order of the bankruptcy court." Id. (citing William L. Norton, Jr. & William L. Norton III, 8 Norton Bankruptcy Law & Practice § 170:87 (3d ed. 2018)).

While equitable mootness often arises in appeals from orders confirming plans of reorganization, we have held that it is also applicable in appeals that effectively "seek[] to modify or amend [a plan's] provisions." Smith v. United States (In re Holywell Corp.), 911 F.2d 1539, 1543 (11th Cir. 1990), rev'd on other grounds sub nom. Holywell Corp. v. Smith, 503 U.S. 47 (1992). This is because a plan is "a consensual arrangement arrived at through lengthy negotiation" and modifying a portion of the plan on appeal "would amount to imposing a different plan of reorganization on the parties" than the one for which they bargained. See In re Specialty Equip. Cos., Inc., 3 F.3d 1043, 1049 (7th Cir. 1993). We review a district court's determination of equitable mootness de novo. Bennett, 899 F.3d at 1246 n.2. We have applied the doctrine in a variety of circumstances, including in a Chapter 13 individual bankruptcy, see id. at 1242 (citing Hope v. Gen. Fin. Corp. of Ga. (In re Kahihikolo), 807 F.2d 1540, 1543 (11th Cir. 1987)), and we can discern no reason to find the doctrine inapplicable in this case.

"The facts will weigh in favor of finding equitable mootness when allowing an appeal to go forward will impinge upon actions taken to one's detriment in good faith reliance on a final and unstayed judgment." Id. at 1248 (quotation omitted

14

and cleaned up).  Among the factors a court should consider in deciding whether to dismiss an appeal for equitable mootness are whether the appellant has obtained a stay pending appeal, whether the plan has been substantially consummated, and whether third parties' rights or the debtor's ability to successfully reorganize would be adversely affected by granting the relief sought by the appellant.  First Union Real Est. Equity & Mortg. Invs. v. Club Assocs. (In re Club Assocs.), 956 F.2d 1065, 1069 n.11 (11th Cir. 1992).  Whether a stay is in place and whether the plan has been substantially consummated are especially important.  See, e.g., Bennett, 899 F.3d at 1252–53 (dismissing an appeal on the ground of equitable mootness where the debtor and others had "taken significant and largely irreversible steps in reliance on the unstayed plan confirmed by the bankruptcy court.").  The failure to timely obtain a stay is critical because it is an "important policy of bankruptcy law that court-approved reorganization plans be able to go forward based on court approval unless a stay is obtained."  Miami Ctr. Ltd. P'ship v. Bank of N.Y., 838 F.2d 1547, 1555 (11th Cir. 1988).  Substantial consummation of the plan also is an important marker because "[f]or the general bankruptcy enterprise, inability to rely on a plan before exhaustion of all appeals would entail delay that would often impair or kill the most beneficial opportunities.  The debtor's chance for a 'fresh start' could be seriously impaired."  13B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3533.2.3 (3d ed. 2021).

15

We turn, then, first to whether NLG unreasonably delayed or failed to obtain a stay. See Bennett, 899 F.3d at 1249, 1251 (noting that an unreasonable delay or failure to obtain a stay weighs in favor of finding an appeal equitably moot). The Bankruptcy Judgment was issued on October 31, 2017 but NLG did not seek a stay until August 8, 2018. Not only did NLG's counsel confirm that there was no stay in place, but, in this case, the bankruptcy court warned NLG at the May 30, 2018 Confirmation Hearing that if the plan confirmation and consummation occurred it could "moot out the appeal . . . . If there's a stay, then nothing can happen until the matter is decided . . . ." Nonetheless, NLG waited more than two months after the confirmation hearing, and approximately nine months after the Bankruptcy Judgment was first entered, to seek a stay.

In the face of this substantial delay, the bankruptcy court denied the motion as untimely on August 22, 2018. NLG again sought a stay on October 17, 2018 immediately after this appeal was filed, but this application was denied as well. By the time the second motion to stay was filed in bankruptcy court, nearly a year had passed since the Bankruptcy Judgment had issued, the Plan had been confirmed, and, as we discuss further, the Plan had been substantially consummated. NLG claims that even though no stay had been granted, this was not for "lack of trying." The record says otherwise. NLG's delay in seeking a stay was unreasonable.

16

Second, and closely related to the stay inquiry, this Plan has been substantially consummated. "When a reorganization has been 'substantially consummated,' as that term is defined in the Bankruptcy Code, see 11 U.S.C. § 1101(2),[6] there is a 'strong presumption' that an appeal of an unstayed order is moot." In re Delta Air Lines, Inc., 374 B.R. 516, 522 (S.D.N.Y. 2007) (citation omitted); see also Miami Ctr., 838 F.2d at 1557 (noting that when "the plan had been substantially consummated and . . . its fairness, feasibility, and propriety had been verified, and . . . it had become legally and practically impossible to unwind the consummation . . . [t]he district court was required to dismiss the appeal as moot.").

NLG claims, however, that the Plan was not substantially consummated since "no property was transferred." This is belied by the facts and the evidence presented to the bankruptcy court. As the district court observed, "the Plan called for all pre-petition property of the estate to re-vest in the Reorganized Debtor and

---

[6] "[S]ubstantial consummation" of a plan of reorganization is defined by statute this way:

    (A)  transfer of all or substantially all of the property proposed by the plan to be transferred;

    (B)  assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

    (C)  commencement of distribution under the plan.

11 U.S.C. § 1101(2).

that has happened." The district court also found that Hazan had assumed the management of all of the property, and the parties do not dispute that Hazan has commenced distribution under the Plan.[7] The Plan has been substantially consummated.

Third, we consider "whether relief granted by the court could implicate or have an adverse effect on [third party] creditors and will affect the re-emergence of the debtor as a revitalized entity." Miami Ctr., 838 F.2d at 1555 (noting that creditors voting in favor of a plan consent to the plan as a whole and we do not "allow a 'piecemeal dismantling' of a reorganization plan."); see also Specialty Equip., 3 F.3d at 1049 (holding that a plan was "a consensual arrangement arrived at through lengthy negotiation" and that excising a provision "would amount to imposing a different plan of reorganization on the parties" than the plan to which they agreed); Aurelius Cap. Master, Ltd. v. Tousa Inc., Nos. 08-61317-CIV, 08-61335-CIV, 2009 WL 6453077, at *9 (S.D. Fla. Feb. 6, 2009) (finding appeal equitably moot because "the piecemeal excision of specific provisions integral to the negotiated whole undermines the requisite consent").

---

[7] NLG claimed that the record does not support the district court's determination that more than $500,000 has been distributed under the Plan. Because the statutory definition of "substantial consummation" just requires "commencement of distribution," 11 U.S.C. § 1101(2)(C), and because the parties do not dispute that Hazan did in fact commence distribution, this dispute does not change our analysis.

18

NLG argues that the third parties would not be affected because Hazan's Plan did not call for the exempt Fisher Island Property to be used to pay any creditors. It also claims there is no evidence to indicate that any unsecured creditor would be affected by a reversal. As for the secured creditors, and specifically, Chase Bank, NLG says that Chase Bank never relied on the Bankruptcy Judgment.

We disagree. For starters, the Disclosure Statement provided that the equity in the Property would support a refinancing, which could be used to support a funding plan, if necessary. There is no merit to the claim that granting NLG relief would not affect creditors, because Hazan's retention of equity in the Property was integral to executing the Plan. If she failed to retain equity, one of the Plan's critical funding options would be lost. In the second place, the Plan provided that while secured creditor Chase Bank's claim is adjudicated in state court, Chase "shall have adequate protection in the form of an equity cushion that exceeds the amount of the loan." But if the Plan were modified as a result of a reinstatement of NLG's claimed first position mortgage, Chase Bank's equity cushion would be eliminated. Third, because the Plan, which the parties had agreed to, included a provision disallowing NLG's claim -- and creditors, including Chase Bank, "had [not] consented to the earlier disclosure statement which did not incorporate the disallowance of NLG's claim" -- a finding in favor of NLG would result in a modification of the Plan which would, in turn, deprive the parties of the benefit of

19

the bargain to which they consented.  See Miami Ctr., 838 F.2d at 1556 (finding equitable mootness supported because successful appeal would deprive secured creditor of the benefit of the bargain based on which it supported the plan).

Accordingly, we affirm the judgment of the district court dismissing this appeal.[8]

**AFFIRMED.**

---

[8] We note in passing that a separate motion to dismiss the appeal was filed on Appellees' behalf. The motion, however, was filed by an individual who had not filed an Appearance of Counsel Form.  11th Cir. R. 46-5 ("Every attorney . . . must file an Appearance of Counsel Form in order to participate in a case before the court.").  Because the motion to dismiss was filed by someone other than Appellees' counsel of record and was not otherwise signed by Appellees, we find the motion procedurally deficient and decline to consider the motion's contents.  See Fed. R. App. P. 32(d) ("Every brief, motion, or other paper filed with the court must be signed by the party filing the paper or, if the party is represented, by one of the party's attorneys."); see also United States v. Aleman, 832 F.2d 142, 146 n.7 (11th Cir. 1987) (noting that the district court "was not required to consider the contents of a motion . . . submitted by someone not officially representing [the party].").